# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| NATIONAL CHICKEN COUNCIL,<br>1152 Fifteenth Street, N.W., Suite 430<br>Washington, D.C. 20005,<br><br>MEAT INSTITUTE,<br>4201 Wilson Boulevard, Suite 0604<br>Arlington, VA 22203<br><br>SOUTHWEST MEAT ASSOCIATION,<br>9696 E. State Highway 21, Suite 200<br>Bryan, TX 77808,<br><br>and<br><br>TEXAS BROILER COUNCIL,<br>595 Round Rock West Drive, Suite 305<br>Round Rock, TX 78681,<br><br>*Plaintiffs*,<br><br>v.<br><br>TOM VILSACK, in his official capacity as<br>SECRETARY OF AGRICULTURE,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>and<br><br>BRUCE SUMMERS, in his official capacity as<br>ADMINISTRATOR of the AGRICULTURAL<br>MARKETING SERVICE,<br>1400 Independence Avenue, S.W.,<br>Washington, D.C. 20250,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:24-cv-03786 |

<u>**COMPLAINT**</u>

Plaintiffs National Chicken Council, Meat Institute, Southwest Meat Association, and Texas Broiler Council bring this Complaint against Defendants Tom Vilsack, in his official capacity as Secretary of the Department of Agriculture (USDA), and Bruce Summers, in his official capacity as Administrator of the USDA's Agricultural Marketing Service (AMS), and allege as follows:

**PRELIMINARY STATEMENT**

1.      This is an action challenging a regulation recently issued by AMS entitled *Inclusive Competition and Market Integrity under the Packers and Stockyards Act*, 89 Fed. Reg. 16,092 (Mar. 6, 2024) (to be codified at 9 C.F.R. pt. 201) (the "Final Rule").

2.      The Final Rule was promulgated under Sections 202(a) and (b) of the Packers and Stockyards Act (PSA), as amended.  *See* 7 U.S.C. § 192(a) and (b).  The Fifth Circuit—along with every other circuit court of appeals to address the issue—has held that any violation of Sections 202(a) or (b) requires a showing of actual or likely injury to competition.  Yet in the guise of promoting anti-discrimination principles, the Final Rule unlawfully concludes that a Section 202 violation can be found when the claimant does not make any showing of actual or likely injury to competition.  *See* 9 C.F.R. § 201.304; *see also* 89 Fed. Reg. at 16,092.

3.      Plaintiffs and their members oppose all forms of discrimination on the basis of race or membership in another protected class in the meat and poultry industries.  To that end, Plaintiffs and their members maintain robust controls to prevent such discriminatory practices, root out such discrimination where it exists, and ensure that it finds no home in their industries.

4.      Yet the approach taken by AMS here—unlawfully importing rudderless antidiscrimination principles into an agency rulemaking that purportedly implements a

competition statute—is neither a viable solution to combating discrimination nor a lawful exercise of agency authority.

5.      The agency's position is contrary to binding law and thus is unlawful under the Administrative Procedure Act (APA).  Eight courts of appeals, including the Fifth Circuit, have held that activity must actually or likely injure competition to be actionable under Section 202(a) or (b) of the PSA.  By imposing liability without such a showing, the Final Rule exceeds the agency's statutory mandate and is otherwise unlawful.

6.      The Final Rule also is arbitrary and capricious.  The Final Rule is based on factors that Congress has not intended USDA to consider—including harm to individual producers apart from injury to competition as a whole.  And the evidence relied upon by USDA in the rulemaking process does not support a finding of widespread discrimination necessary to justify the Final Rule.

7.      For all of these reasons, the Final Rule is unlawful, in excess of statutory authority, arbitrary and capricious, and should be set aside.

## PARTIES

8.      Plaintiff National Chicken Council (NCC) is a national, nonprofit trade association organized in the District of Columbia with its principal place of business at 1152 Fifteenth Street, N.W., Suite 430, Washington, D.C. 20005.  NCC represents vertically integrated companies that produce and process more than 95 percent of the chicken marketed in the United States.  Many NCC members are "live poultry dealers" or "packers" under the PSA and thus suffer harm under the Final Rule, as shown by their inclusion in USDA's "Poultry Dealer List" accessible on USDA's website at https://www.ams.usda.gov/rules-

regulations/packers-and-stockyards-act/regulated-entities/live-poultry-dealer.  All live poultry

dealers are subject to the requirements of the Final Rule.

9.      Plaintiff Meat Institute is a national, nonprofit trade association organized in the

District of Columbia with its principal place of business at 4201 Wilson Boulevard, Suite 0604,

Arlington, VA 22203.  The Meat Institute is the nation's oldest and largest trade association

representing packers and processors of beef, pork, lamb, veal, turkey, and processed meat

products.  Meat Institute members account for more than 95 percent of United States output of

these products.  Many Meat Institute members are "live poultry dealers" or "packers" under the

PSA and thus suffer harm under the Final Rule, as shown by their inclusion in USDA's "Packer

List" accessible on USDA's website at https://www.ams.usda.gov/rules-regulations/packers-and-

stockyards-act/regulated-entities/packer.  All packers listed on the Bonded Packer list, as well as

others, are subject to the requirements of the Final Rule.

10.      Plaintiff Southwest Meat Association (SMA) is a national, non-profit trade

association organized in Texas with its principal place of business at 9696 E. State Highway 21,

Suite 200, Bryan, TX 77808.  SMA represents packer and processor members in 37 states.  Many

SMA members are "live poultry dealers" or "packers" under the PSA and thus suffer harm under

the Final Rule as shown by their inclusion in USDA's "Packer List" accessible on USDA's

website at https://www.ams.usda.gov/rules-regulations/packers-and-stockyards-act/regulated-

entities/packer.  All packers listed on the Bonded Packer list, as well as others, are subject to the

requirements of the Final Rule.

11.      Plaintiff Texas Broiler Council (TBC) is a national, non-profit trade association

organized in Texas with its principal place of business at 595 Round Rock West Drive, Suite

305, Round Rock, TX 78681.  TBC represents broiler industry members that encompass all

phases of the broiler business, including broiler integrators, broiler processors, breeders and other sellers of broilers, and contract growers.  Many TBC members are "live poultry dealers" or "packers" under the PSA and thus suffer harm under the Final Rule, as shown by their inclusion in USDA's "Poultry Dealer List" accessible on USDA's website at https://www.ams.usda.gov/rules-regulations/packers-and-stockyards-act/regulated-entities/live-poultry-dealer.

12.     Defendant Tom Vilsack is the Secretary of the Department of Agriculture (the "Secretary") and is ultimately responsible for administering and enforcing the PSA, 7 U.S.C. § 181 *et seq.*  Defendant Vilsack maintains an office at 1400 Independence Avenue, S.W., Washington, D.C. 20250.  Defendant Vilsack is sued in his official capacity only.

13.     Defendant Bruce Summers is the Administrator of the USDA's Agricultural Marketing Service.  He is responsible for overseeing AMS, which promulgated the Final Rule and administers programs to support U.S. agriculture.  Defendant Summers maintains an office at 1400 Independence Avenue, S.W., Washington, D.C. 20250.  Defendant Summers is sued in his official capacity only.

## JURISDICTION AND VENUE

14.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–02, in that there exists an actual justiciable controversy as to which Plaintiffs require a declaration of their rights by this Court and injunctive relief to prohibit Defendants from violating laws and regulations.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which Defendants are officers of the United States acting in their official capacities, a substantial part of the events under review occur in this district, and one of the plaintiffs resides in this district.

## FACTUAL BACKGROUND

### A. Statutory Background

16.     The PSA was enacted in 1921 to address concerns about the growing control over the interstate food industries by five meat-packing conglomerates.  61 Cong. Rec. 1864–66 (statement of Rep. Voigt); *see also* Current Legislation, *The Packing Industry and the Packers Act*, 22 Colum. L. Rev. 68, 68–69 (1922) (describing the impact the Big Five had on the interstate food markets).  The statute's "primary purpose" was to function as an antitrust statute "to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry."  H.R. Rep. No. 85-1048, at 1 (1957), *reprinted in* 1958 U.S.C.C.A.N. 5212, 5213.

17.     To serve that end, Sections 202(a) and (b) of the PSA make it unlawful for "any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry" to:

    (a)    Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

    (b)    Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect.

7 U.S.C. § 192(a) and (b).

18.     Since its enactment, circuit courts of appeals have consistently and unanimously held that the statute requires proof of actual or likely injury to competition to support a violation.

19.     In 2008, Congress passed the 2008 Farm Bill, Pub. L. 100-246 (the "2008 Farm Bill").  Section 11006 of the 2008 Farm Bill directed the Secretary to promulgate regulations "to establish criteria that the Secretary will consider in determining whether an undue or unreasonable preference or advantage has occurred in violation of such Act."  Pub. L. 100-246 § 11006(1).  It did not grant AMS authority to eliminate the competitive injury requirement.

20.     Like the 2008 Farm Bill's statutory text, the bill's legislative record demonstrates Congressional unwillingness to alter the competition-injury requirement.  The original draft of the bill contained an express provision eliminating the competition-injury requirement under Sections 202(a) and (b).  *See* Competitive and Fair Agricultural Markets Act of 2007, S. 622, 110th Cong. § 202 (2007) (proposing to amend section 202(a) to state that a business practice can be found to be "unfair, unjustly discriminatory or deceptive" "regardless of whether the practice or device causes a competitive injury or otherwise adversely affects competition and regardless of any alleged business justification of the practice or device."); *see also* H.R. 2135, 110th Cong. § 202 (same).  That legislation did not pass in either the Senate or the House.

21.     In 2010, AMS's predecessor agency, the Grain Inspection, Packer and Stockyards Administration (GIPSA), tried to read into the 2008 Farm Bill abrogation of the injury-to-competition requirement.  75 Fed. Reg. 35,338, 35,351 (June 22, 2010) (proposing that "[c]onduct can be found to violate § 202(a) and/or (b) of the [PSA] without a finding of harm or likely harm to competition."); *see also id.* at 35,340.

22.     Congress stymied that effort by passing appropriations bills for fiscal years 2012 through 2015 prohibiting GIPSA from expending any funds to publish an interim or final rule abrogating the injury-to-competition requirement, as proposed, or any substantially similar rulemaking.  *See* Consolidated and Further Continuing Appropriations Act, 2015, H.R. 83, 113th

Cong. § 731 (2014); Consolidated Appropriations Act, 2014, H.R. 3547, 113th Cong. § 744 (2014); Consolidated and Further Continuing Appropriations Act, 2013, H.R. 933, 113th Cong. §§ 742–43 (2013); Consolidated and Further Continuing Appropriations Act, 2012, H.R. 2112, 112th Cong. § 721 (2011).

23.     Throughout the many decades of the PSA's existence, USDA has never used Section 202 to attempt to combat perceived discrimination—until now.

### B.  The Proposed and Final Rules

24.     In October 2022, AMS issued a Proposed Rule entitled *Inclusive Competition and Market Integrity Under the Packers and Stockyards Act* (the "Proposed Rule"), 87 Fed. Reg. 60,010 (Oct. 3, 2022).

25.     The stated purpose of the Proposed Rule was to "enhance those basic protections that modern livestock and poultry producers need to promote inclusive competition and market integrity." *Id.* at 60,010.

26.     In relevant part, the Proposed Rule stated that a regulated entity "may not prejudice, disadvantage, inhibit market access, or otherwise take adverse action against a covered producer" based upon "the covered producer's status as a market vulnerable individual or as a cooperative." *Id.* at 60,054.  The term "market vulnerable individual" was defined to mean "a person who is a member, or who a regulated entity perceives to be a member, of a group whose members have been subjected to, or are at heightened risk of, adverse treatment because of their identity as a member or perceived member of the group without regard to their individual qualities," and included "a company or organization where one or more of the principal owners, executives, or members would otherwise be a market vulnerable individual." *Id.*

27.     The Proposed Rule also stated that a regulated entity "may not retaliate or otherwise take an adverse action against a covered producer because of the covered producer's participation" in specified activities.  *Id.*

28.     The Proposed Rule also included a recordkeeping requirement that covered "all records relevant to" the regulated entity's "compliance with" the rule for a period of at least five years from the date of record creation.  *Id*. at 60,055.

29.     Although it was premised on Sections 202(a) and (b) of the PSA, the Proposed Rule did not include actual or likely injury to competition as an element of a violation.  *Id*. at 60,010.  AMS asserted that the Proposed Rule was directed to addressing "many unduly prejudicial, unjustly discriminatory, and deceptive practices," which "the current regulations do not adequately address."  *Id.* at 60,014.

30.     AMS acknowledged in the Proposed Rule that the terms "undue or unreasonable prejudice" and "unjust discrimination" are not defined in the PSA, and it ascribed meaning to those terms based on modern (that is, 2022) dictionary definitions and contemporary (that is, 1998) agency decisions.  *Id.* at 60,015 nn.47 & 48.

31.     Following issuance of the Proposed Rule, AMS received 446 comments from industry trade associations, including Plaintiffs, and other commenters.  89 Fed. Reg. at 16,092 (Mar. 6, 2024).  Multiple commenters, including Plaintiffs, explained that the Proposed Rule unlawfully ignored established legal precedent by asserting that discriminatory conduct can violate Sections 202(a) or (b) even in the absence of any showing of injury or likely injury to competition.  *Id.* at 16,166.

32.     AMS issued the Final Rule in March 2024.  The Final Rule adopted the Proposed Rule largely "as is," with additional modifications designed "to increase specificity and, therefore, certainty and enforceability."  *Id.*

33.     The Final Rule provides that a regulated entity "may not prejudice, disadvantage, inhibit market access, or otherwise take an adverse action against a covered producer" on the basis of "the covered producer's race, color, religion, national origin, sex (including sexual orientation and gender identity), disability, marital status, or age."  9 C.F.R. § 201.304(a)(1). The Final Rule also prohibits retaliation or adverse action based on participation in a list of specified activities.  *Id.* § 201.304(b).  The Final Rule further prohibits the use of a "false or misleading statement" or "omission of material information necessary to make a statement not false or misleading" in conjunction with various stages of the contracting process.  *Id.* § 201.306. Like the Proposed Rule, the Final Rule does not require a showing of actual or likely injury to competition to support a violation.  *Id.* §§ 201.304(a), (b), 201.306.

34.     In response to the comments it received regarding the lack of a competitive-injury requirement, AMS responded that the agency was "exercising broad authority to define the scope of secs. 202(a) and (b)" and "has determined that the prohibited practices are likely to exclude producers from the market, thereby lessening competition and causing widespread marketplace harm if not addressed in their incipiency, *before competitive injury has occurred*."  89 Fed. Reg. at 16,167 (emphasis added).

35.     The agency also stated that "it has been the Agency's longstanding position that because the Act addresses more and different types of harmful conduct than antitrust laws, *a showing of competitive injury is not required to establish violations of secs. 202(a) and 202(b)*." *Id.* (emphasis added).

10

36.     To substantiate the findings in the Final Rule, AMS relied principally on unattributed and anecdotal evidence of disparate outcomes among minority producers compared to majority producers and subjective complaints of perceived discrimination by individual producers.  The agency did not identify any injury to competition as a whole.  *See id.* at 16,101–16,112 (summarizing anecdotal evidence of disparate outcomes and subjective complaints of discrimination); *id.* at 16,110 ("find[ing] that [the enumerated bases of discrimination recognized in other Federal law] are consistent with [AMS's] understanding drawn from complaints and in the field, and accordingly adopt[ing] these bases as part of this rule").

37.     The Final Rule retained the five-year recordkeeping requirement set forth in the Proposed Rule, which "may include" a wide variety of materials including "policies and procedures, staff training materials, materials informing covered producers regarding reporting mechanisms and protections, compliance testing, board of directors' oversight materials, and the number and nature of complaints received relevant to this section."  9 C.F.R. § 201.304(c).

### C.  The Final Rule is Unlawful.

38.     Agency action violates the APA when it violates the agency's governing statute. *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 315 (2014).  Agency action also violates the APA when it is arbitrary and capricious, including where it is based on factors Congress did not intend the agency to consider or relies on an inadequate factual record.  *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  AMS violated all of these maxims in promulgating the Final Rule.

39.     First, the Final Rule violates the PSA and exceeds USDA's statutory authority by imposing liability without regard to whether the covered entity has injured (or is likely to injure) competition through its conduct.  That alone dooms the Final Rule under the APA.  *See Morrison*

*v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 261–62 (2010) (regulation promulgated under a statute "does not extend beyond conduct encompassed by [the statute's] prohibition") (*quoting United States v. O'Hagan*, 521 U.S. 642, 651 (1997)).

40.     There can be no real dispute that Section 202 of the PSA requires a showing of actual or likely injury to competition.  The year after the PSA's passage, the Supreme Court upheld the statute in the face of a constitutional challenge.  *Stafford v. Wallace*, 258 U.S. 495, 520 (1922).  Central to the Supreme Court's holding was that the PSA "protects competition and opposes combinations in restraint of interstate trade."  *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 357–58 (citing *Stafford*, 258 U.S. at 520).

41.     In the more than one hundred years since *Stafford*, courts have uniformly recognized the PSA's antitrust foundation, including in Sections 202(a) and (b).  In keeping with that foundation, a long list of circuit courts of appeals have found that Section 202 specifically requires a showing of actual or likely injury to competition.  USDA was a party or amicus in many of those cases and directly presented its "longstanding position" that actual or likely injury to competition is not a requirement under Section 202(a) or (b) of the PSA, but the circuit courts of appeal have consistently rejected that interpretation.

42.     Start with the Fifth Circuit.  In 2009, the Fifth Circuit squarely held—en banc— that "an anti-competitive effect is necessary for an actionable claim under the PSA in light of the Act's history in Congress and its consistent interpretation by the other circuits."  *Wheeler*, 591 F.3d at 362.  The Fifth Circuit rejected the USDA's longstanding position—the position that USDA reiterated in the Final Rule—that "a showing of competitive injury is not required to establish violations of secs. 202(a) and 202(b)," and observed that "Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices

which are neither deceptive nor injurious to competition nor intended to be so by the party charged." *Id.* (quoting *Armour & Co.*, 402 F.2d at 722).

43.     In using the terms "unfair," "unjustly discriminatory," and "undue or unreasonable preference" in the PSA, Congress followed the template set forth in the Interstate Commerce Act of 1887 and the Federal Trade Commission Act of 1914.  The meaning of these terms "had been firmly established in numerous court decisions that placed definite limits on the authority of . . . the Interstate Commerce Commission and Federal Trade Commission." *Id.* at 366–67 (Jones, J., concurring).  "Congress intended, and made plain by its choice of language, that injury to competition would be an element of the inquiry." *Id.*

44.     The Fifth Circuit pointed out that the United States had appeared as amicus "to contend that the courts have had the PSA wrong and that it should be construed to make unfair practices unlawful without regard to competition." *Id.* at 362 (majority op.).  But the court declined to accord *Chevron* deference to the government's interpretation "where Congress has delegated no authority to change the meaning the courts have given to the statutory terms[.]" *Id.* This holding now has all-the-more force following the Supreme Court's recent decision overturning *Chevron.  See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

45.     Seven other federal circuit courts have also construed Section 202 of the PSA. Every circuit court to consider the issue has held that an essential element of a Section 202(a) or (b) violation is a showing of competitive injury or likely competitive injury.  *See Philson v. Goldsboro Milling Co.*, 1998 WL 709324, at *4 (4th Cir., Oct. 5, 1998); *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010); *Pac. Trading Co. v. Wilson & Co.*, 547 F.2d 367, 369–70 (7th Cir. 1976); *Armour & Co v. United States*, 402 F.2d 712, 718 (7th Cir. 1968); *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999); *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458

(8th Cir. 1995); *Farrow v. United States Dep't of Agriculture*, 760 F.2d 211, 214 (8th Cir. 1985);

*DeJong Packing Co. v. United States Dep't of Agric.*, 618 F.2d 1329, 1337 (9th Cir. 1980); *Been*

*v. O.K. Indus., Inc.*, 495 F.3d 1217, 1230 (10th Cir. 2007); *Pickett v. Tyson Fresh Meats, Inc.*,

420 F.3d 1272, 1280 (11th Cir. 2005); *London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1303

(11th Cir. 2005).

    46.    The Sixth Circuit's 2010 decision adeptly summarizes the judicial landscape:

> This issue is not novel to other courts; it has been addressed by seven of our sister circuits, with consonant results.  All of these courts of appeals unanimously agree that an anticompetitive effect is necessary for an actionable claim under subsections (a) and (b).  For the reasons that follow, we join this legion.

    47.    *Terry*, 604 F.3d at 276.  Accordingly, the Sixth Circuit noted that, after the Fifth

Circuit's en banc decision in *Wheeler*, the "prevailing tide" of circuit court decisions holding

"that subsections (a) and (b) of [Section 202] require an anticompetitive effect" had become "a

tidal wave."  *Id.* at 277.

    48.    The Final Rule runs directly contrary to Sections 202(a) and (b) of the PSA, as

interpreted by the courts for decades.  The Final Rule would effectuate—"without clear

congressional authorization"—an "enormous and transformative expansion in [USDA's]

regulatory authority" by creating in AMS a wide-ranging antidiscrimination enforcement power.

*Utility Air Regulatory Grp.*, 573 U.S. at 324.

    49.    Moreover, to the extent Congress has weighed in on the competitive-harm

requirement of Section 202 since the PSA's passage in 1921, Congress has disapproved any

attempt to jettison the requirement by not enacting an express provision eliminating the

requirement in the 2008 Farm Bill and by prohibiting USDA (for years) from finalizing earlier

iterations of proposed rules that would have eliminated the harm-to-competition requirement.

Congressional inaction in the face of decades of precedent affirming the competitive-injury

requirement of Section 202 indicates that Congress has accepted this settled interpretation.  *See Wheeler*, 591 F.3d at 361–62; *see also General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 594, 599 (2004).

50.     The newfound authority that USDA claims in the Final Rule to address discrimination—uncoupled from competitive harm—is without historical precedent.  Never in its history has USDA attempted to use the PSA to combat perceived discrimination based on the protected class of an individual.  This "'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims, is a 'telling indication' that the [Final Rule] extends beyond the agency's legitimate reach."  *NFIB v. OSHA*, 595 U.S. 109, 119–20 (2022) (per curiam) (quoting *Free Enters. Fund v. Public Co. Accountability Oversight Bd.*, 561 U.S. 477, 505 (2010)).  A roving antidiscrimination mandate "is simply not 'part of what the agency was built for.'"  *Id.* at 119 (citation omitted).

51.     AMS's attempt to read the competitive-injury requirement out of the statute—expanding the statute into a general antidiscrimination law—raises a major question requiring clear Congressional direction.  *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 730–32 (2022) (holding that in cases of "economic and political significance" an agency must demonstrate "clear congressional authorization" to exercise its powers); *see also Nat'l Fed'n of Ind. Bus. v. OSHA*, 595 U.S. 109, 117–18 (2022) (per curiam) (rejecting OSHA's claims of regulatory authority regarding temporary emergency standards); *Al. Ass'n Realtors v. Dep't Health and Human Servs.*, 594 U.S. 758, 764–65 (2021) (per curiam) (rejecting agency claims of regulatory authority regarding nationwide eviction moratorium).  The agency's position finds no home in the statutory text, let alone clear statutory direction, and thus violates the major questions doctrine.

52.     The Final Rule also violates the APA because it is arbitrary and capricious. Among other things, the evidence USDA relied upon in the rulemaking process does not support a finding of widespread and endemic discrimination.  Anecdotal evidence of disparate outcomes among minority producers and subjective complaints of discrimination by producers cannot justify the sweeping and unprecedented intervention enacted by the Final Rule.  *See* 89 Fed. Reg. 16,092, 16,101–16,112.

53.     The Final Rule is also arbitrary and capricious because it is based on "factors which Congress has not intended [USDA] to consider," namely discriminatory harm to producers apart from injury to competition as a whole.  As alleged above, nothing in the text, history, or decades of judicial precedent interpreting the PSA establishes that Congress intended USDA to consider individualized discriminatory harm separate and apart from antitrust harm.

### D.  The Final Rule Causes Concrete and Imminent Harm to Plaintiffs and Their Members, As Well As U.S. Consumers.

54.     Plaintiffs, their members, and U.S. consumers will suffer concrete and imminent harm unless the Final Rule is declared unlawful, vacated, and its enforcement enjoined.

55.     The Final Rule makes contracting more difficult, will deter companies from entering into new producer relationships, will impede efficient market mechanics, will usurp regulated entities' ability to make legitimate business decisions, and requires a wholesale reevaluation of contractual relationships and communications between regulated entities and producers.

56.     Untethering the PSA from its antitrust roots will vastly expand the scope of liability under the PSA and subject regulated entities to expansive, costly, and frivolous litigation—including private causes of action.  *See, e.g.*, *London*, 410 F.3d at 1304 ("Failure to require a competitive impact showing would subject dealers to liability under the PSA for simple

16

breach of contract[.]”); *Been*, 495 F.3d at 1229 (“Not to require a showing of competitive injury or the likelihood thereof would make a federal case out of every breach of contract.  Nothing in the PSA suggests that Congress intended this result.”)

57.     For example, a producer may allege unfair and discriminatory treatment if a regulated entity refuses to contract with a producer because on-farm food-safety interventions, animal-quality production practices, or sustainability measures are at issue between the two parties.

58.     Without the competitive injury requirement, there is no objective standard by which courts, or USDA, can separate prohibited practices from lawful ones.  The terms “discrimination,” “preference” and “advantage” have potentially expansive meanings extending well beyond the economic realm.  As a result, it will be impossible for regulated entities to order their affairs rationally to comply with the Final Rule.  What is unfair, unjust, undue, or unreasonable will depend solely on what an agency adjudicator or fact-finder in civil litigation decide in any given case.

59.     Under the Final Rule, AMS and the courts will be obliged to make value judgments, choosing one set of priorities over another without guidance from the statutory text or other fixed source about which value or set of values is to be preferred in any particular case.

60.     These structural changes in the industry will increase costs, stifle innovation, and introduce risks to animal wellbeing.  Decreased efficiency in the meat and poultry production markets will result in higher costs for U.S. consumers.

61.     Compliance with the Final Rule also will require extensive recordkeeping programs and record-retention systems, and the development and implementation of new

compliance policies and oversight mechanisms.  Implementing these systems and processes will

be burdensome, expensive, and will ultimately contribute to higher costs for U.S. consumers.

62.     Plaintiffs' members thus are suffering and face imminent and concrete injury as a

result of the agency's unlawful Final Rule.  For example, National Beef Packing Company, LLC

(National Beef) is a member of the Meat Institute, and as a meat packer is a regulated entity

under the Final Rule.  Unless the Final Rule is enjoined, National Beef is likely to incur

substantial compliance and recordkeeping costs associated with the Final Rule.  These costs

would not be unique to National Beef.  Like other packers, National Beef will need to assess its

purchasing and/or contracting practices, which are currently based on decades of collaborative

work to establish specifications and qualifications that facilitate the delivery of high-quality beef

to National Beef's customers.  Due to the subjective and unclear standards set forth in the Final

Rule, Meat Institute members like National Beef will likely be forced to modify those practices

and procedures simply to avoid litigation.  As an example, one of National Beef's shareholders is

owned by producers who invest the time and money necessary to feed high-quality cattle that

produce premium beef meeting the specific needs of certain National Beef customers.  Under

their marketing agreements with National Beef, these producers receive premium compensation

for the premium cattle they supply to the company.  The Final Rule jeopardizes those marketing

agreements with producers, the guaranteed sales channel they provide, and the premium

compensation producers will receive for their premium cattle.  Without these guarantees and

quality premiums, producers will not be incentivized to incur the additional costs and efforts to

acquire, raise, and feed livestocks that meet these premium or niche programs.

63.     Similarly, many NCC members are "live poultry dealers," and some also

"packers," under the PSA and are subject to the requirements of the Final Rule.  As a result of

the Final Rule, the many NCC member companies who are live poultry dealers or packers subject to the PSA have been forced to incur substantial costs.  For example, Fieldale Farms Corporation (Fieldale Farms) is a member of NCC, is regulated under the PSA as a live poultry dealer, and has incurred substantial costs under the Final Rule.  These costs are not unique to Fieldale Farms.  As with other live poultry dealers, Fieldale Farms has been forced to incur numerous costs, including costs associated with reviewing, assessing, and as needed modifying hundreds or thousands of contracts; updating contracting practices to ensure compliance with the final rule; reviewing, developing, implementing, and overseeing new procedures or practices with respect to interactions with producers; and implementing and maintaining new recordkeeping processes to demonstrate compliance with the rule.  Due to the subjective, broad, and ambiguous nature of the Final Rule's requirements, many NCC members, including Fieldale Farms, may be forced to modify contracting processes simply to avoid litigation.  Importantly, even though they do not discriminate or retaliate against producers, Fieldale Farms and other NCC member companies have had to incur these costs merely to show they do not as required under the Final Rule.

64.     Likewise, many SMA members are regulated as "live poultry dealers" or "packers" under the PSA and therefore are subject to the Final Rule and suffer harm in the same manner as Meat Institute and NCC member companies.  For example, SMA member ABF Packing, Inc. is a packer under the PSA, and as such is faced with the substantial compliance and recordkeeping costs required of a packer to demonstrate compliance with the Final Rule, including reviewing and potentially modifying contracts; assessing and modifying processes and practices for evaluating, offering, entering into, and terminating contracts; and developing

recordkeeping systems and maintaining records to demonstrate compliance.  SMA members may be forced to modify contracting practices merely to avoid the possibility of litigation.

65.     In the same manner, many TBC members are also "live poultry dealers," and some also "packers," under the PSA and therefore are subject to the Final Rule and suffer harm in the same manner as NCC and Meat Institute member companies.  For example, Holmes Foods is a TBC member and is regulated as a "live poultry dealer" under the PSA, subjecting it to the requirements of the Final Rule.  As with other TBC members who are live poultry dealers, Holmes Foods has been faced with the substantial compliance and recordkeeping costs required of a live poultry dealer under the Final Rule, including reviewing and potentially modifying contracts; assessing and potentially modifying processes and practices for evaluating, offering, entering into, and terminating contracts; and developing recordkeeping systems and maintaining records to demonstrate compliance.  Due to the subjective, broad, and ambiguous nature of the Final Rule, Holmes Foods and other TBC members may be forced to modify contracting practices merely to avoid the possibility of litigation.

66.     This lawsuit seeks to vindicate interests that are germane to Plaintiffs' purposes because a critical mission of all of the Plaintiff associations is to protect their members' interests in connection with policy changes initiated by the agency.

67.     Plaintiffs' members are subject to the Final Rule and will suffer a concrete and imminent injury absent judicial relief.  Among other things, Plaintiffs' members are being forced to incur substantial costs because of compliance and recordkeeping obligations imposed by the Final Rule.  A judgment setting aside the Final Rule will eliminate those costs.

## COUNT I
### (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

68.     Plaintiffs reallege, reassert, and incorporate by reference herein each of the foregoing allegations as though set forth fully herein.

69.     The Final Rule is unlawful, in excess of statutory authority, ultra vires, and in violation of the PSA.

70.     AMS's promulgation of the Final Rule constitutes agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

71.     USDA's reading of the PSA also violates the major-questions doctrine of statutory interpretation.  This doctrine requires "clear congressional authorization" before an agency may decide an issue of great "economic and political significance."  *W. Virginia v. Env't Prot. Agency*, 597 U.S. at 721, 723–24, 729–30.

72.     Congress did not clearly delegate to USDA in the PSA or elsewhere the authority to resolve this major question or to rewrite the PSA as the agency has attempted to do here.

73.     The Final Rule also is arbitrary and capricious.  Among other things, the Final Rule was promulgated based on factors Congress did not intend the USDA to consider and the evidence USDA considered does not support the unprecedented intervention set forth in the rule. The Final Rule thus is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

74.     The Final Rule constitutes final agency action for which Plaintiffs have no other adequate remedy within the meaning of 5 U.S.C. § 704.

75.     There is no mechanism by which Plaintiffs or their members can be made whole for the injury that would result from enforcement of the Final Rule.  Plaintiffs are without an adequate remedy at law because of the unique nature of the harm.

76.     The intent of Congress will be served by an Order declaring the Final Rule to be unlawful and prohibiting its enforcement.  In addition, the public interest will be served by such an Order.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs prays for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that the Final Rule is unlawful;

B.  An order vacating and setting aside the Final Rule;

C.  Preliminary and permanent injunctive relief enjoining enforcement of the Final Rule;

D.  An order awarding Plaintiffs their costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

E.  Such other and further relief as the Court deems just and proper.


Dated:  October 4, 2024                         Respectfully submitted,


                                    By:  *Aaron R. Crane*
                                         Aaron R. Crane
                                         Texas SBN 24050459
                                         Federal ID No. 619093
                                         HOGAN LOVELLS US LLP
                                         609 Main Street, Suite 4200
                                         Houston, TX 77002
                                         Telephone: (713) 632-1446
                                         Facsimile: (713) 632-1401
                                         aaron.crane@hoganlovells.com

Susan M. Cook (pro hac vice forthcoming)
Sean Marotta (pro hac vice forthcoming)
Brian Eyink (pro hac vice forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com
sean.marotta@hoganlovells.com
brian.eyink@hoganlovells.com

Nathaniel Nesbitt (pro hac vice forthcoming)
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333
nathaniel.nesbitt@hoganlovells.com

*Attorneys for Plaintiffs*