IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NATIONAL CHICKEN COUNCIL, *et al.*, | § § § | |
| *Plaintiffs*, | § § | |
| vs. | § § | No. 4:24-cv-03786 |
| | § § | |
| BROOKE ROLLINS, in her official capacity as SECRETARY OF AGRICULTURE, *et al.*, | § § § § | Judge Andrew Hanen |
| *Defendants*, | § § | |
| and | § § | |
| RANCHERS CATTLEMEN ACTION LEGAL FUND UNITED STOCKGROWERS OF AMERICA, WESTERN ORGANIZATION OF RESOURCE COUNCILS, ALABAMA CONTRACT POULTRY GROWERS ASSOCIATION, AND LATINO FARMERS AND RANCHERS INTERNATIONAL, | § § § § § § § § § | |
| *Proposed Defendant-Intervenors.* | § § § | |

### DECLARATION OF BILL BULLARD

I, BILL BULLARD, am over the age of 18, have personal knowledge of the facts set forth herein, and, if called as a witness, could and would competently testify to the following:

1. I am the Chief Executive Officer of the Ranchers Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF"). I have held this position since April 2001.

2. I make this declaration in support of R-CALF and other Farmer and Rancher Organizations' motion to intervene in this case, which challenges the United States Department of Agriculture's ("USDA") Final Rule issued March 6, 2024, entitled "Inclusive Competition and Market Integrity Under the Packers and Stockyard Act" (the "Rule").

3. R-CALF is a national, membership-based, 501(c)(6) tax-exempt organization incorporated in the state of Montana that exclusively represents the interests of independent, domestic, cattle and sheep producers. We are located at 3202 3rd Avenue N #305, Billings, MT 59101.

4. R-CALF has approximately 3,500 voluntary, dues-paying, voting members in forty-two states. This includes members in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

5. R-CALF members directly determine R-CALF's advocacy and policy positions through a resolution introduction and voting process. Members attending the R-CALF annual membership meeting introduce policy positions that are voted upon by attending members. Policy resolutions approved by the attending members are then mailed to each voting member in a mail-in ballot. When ballots are counted, approved policy resolutions become permanent policy

positions of the organization and R-CALF's advocacy is conducted pursuant to its permanent policy positions.

6. R-CALF's mission is to represent U.S. cattle and sheep industries in trade and marketing issues to ensure the continued profitability and viability of U.S. cattle and sheep producers. R-CALF was incorporated specifically to address the market interests of U.S. cattle producers, including the threats posed to the domestic live cattle industry by unfair and illegal trade practices.

7. There are three separate production steps along the live cattle supply chain before cattle are slaughtered and converted to beef. Those steps are cow/calf production, background and stocking, and cattle feeding. The cow/calf production phase involves breeding cows to produce new calves that are either sold after being weaned or raised and fed for longer periods. Background and stocking operations buy young, weaned calves from cow/calf producers and continue to grow and feed those animals to add on weight before they are placed into a feedlot for finishing, usually selling them when they are a year old. Cattle feeding is the last phase in which cattle are fed in feedlots until reaching their harvest weight before being sold to the packer for slaughter.

8. While the industry is mostly split into these three phases, that is not always the case. Some ranchers may combine the cow/calf segment and background/stocking segment and sell heavier weight steers and heifers directly to feedlots. Some operations may retain calves from birth to delivery to a packer as a finished steer or heifer – described below. Other operations will retain the calf throughout its life and sell directly to the consumer.

9. The "Big Four" meatpacking companies, Cargill Meat Solutions, Tyson Fresh Meats, JBS S.A., and National Beef Packing Co. ("packers") control the U.S. beef packing

capacity, collectively purchasing and processing more than 80 percent of the United States' fed cattle. These packers purchase cattle after they reach their harvest weight or may enter a contract with a cattle feeder before the cattle are finished for delivery once the cattle have reached slaughter weight.

10. Often, cattle are sold between each of the production steps before being sold to a packer. Such sales can happen at local auction yards where cattle from many different ranchers are up for sale or can be brokered by what are called "order buyers" who fill orders for purchasers by buying cattle directly from specific ranchers. And as mentioned above, finished cattle that are ready for slaughter may also be sold through contracts with packers that are agreed before the cattle reaches its final weight.

11. R-CALF's members are involved in all stages of the cattle production process and include cow/calf producers, stockers and backgrounders, as well as feedlot owners and cattle feeders.

12. On behalf of its members, R-CALF regularly engages in advocacy on federal policy issues. This includes testifying before the Legislative and Executive branches, lobbying members of Congress, working with agency decision-makers in the regulatory process, and litigating when necessary to protect and advance member interests.

13. One of the major threats to the American cattle industry and R-CALF's members is the highly concentrated meatpacking industry. The Big Four's purchasing power provides them with significant leverage over cattle feeders, who only have a short two to four week window to market their slaughter-weight fed cattle to the packer. This same market power creates the risk that the packers will engage in unfair, retaliatory, deceptive, and discriminatory practices that deprive cattle feeders of the true and fair value of their cattle.

4

14.     R-CALF has worked with other farm and ranch groups to compile a list of unfair practices that occur in the cattle industry, derived from producer experiences and reports from R-CALF members and other industry participants. *See, e.g., Public Comment on Fair and Competitive Livestock and Poultry Markets Proposed Rule*, WESTERN COALITION OF RESOURCE COUNCILS, 7–9 (Sep. 11, 2024), https://www.regulations.gov/comment/AMS-FTPP-21-0046-13176. For example, I have received reports from our members of packers engaging in unfair "pick-up" practices, in which their bid is contingent upon the farmer or rancher having to delay delivery of their cattle for weeks after a price for the cattle has been negotiated, degrading the carcass performance of the cattle sold, and forcing the producer to incur substantial additional and unanticipated production costs, that would have been avoided if timely delivery had been allowed.

15.     I have received reports from members and other industry participants expressing their concerns and fears that if they resist or even question a packer's practices, attempt to join a producer association to increase their bargaining power, or otherwise try to assert their lawful rights against an abusive contracting or buying situation, packers will retaliate against them by terminating contracts or blacklisting them (*i.e.*, threats not to visit their feedlot). I am aware of at least one member who believes he was blacklisted in this way. Effectively, the packers can credibly threaten to run an American cattle feeder out of business for any perceived slight.

16.     While certain of our members report having experienced this mistreatment firsthand and expect to be exposed to abuse in the future, past reports of retaliation by packers has led to a culture of fear and silence. R-CALF's members fear, understandably so, that coming forward personally in this legal proceeding would put their businesses and livelihoods at risk. For example, Plaintiff Meat Institute is highly connected with the Big Four packers on whom

cattle feeders depend to purchase their fed cattle once finished. That this very lawsuit seeks to strike down a Rule written to protect our members from this kind of retaliation only amplifies the risk and fears among R-CALF's members.

17.     This fear is not conjecture. For example, in response to R-CALF's actions to protect the health of the U.S. cattle herd by supporting a ban on the importation of Canadian cattle while Canada was experiencing outbreaks of mad cow disease, a U.S.-based global beef packer operating in Canada announced in 2004 that it would no longer buy cattle from R-CALF members. *Canadian Meat Processor Won't Buy Cattle With Ties to R-CALF*, ASSOCIATED PRESS (Aug. 7, 2004), https://helenair.com/news/state-regional/canadian-meat-processor-wont-buy-cattle-with-ties-to-r-calf/article_079f1e41-f3b6-5711-ac69-9f27e3ce953e.html. Past events of retaliation have a chilling effect on our members' willingness to express concerns about packer practices and on our ability to grow our organization's membership.

18.     For years, R-CALF has engaged in efforts to eliminate these fundamentally unfair trade practices from livestock markets and rebalance the disparate bargaining positions between livestock producers and highly concentrated meatpackers. Among other initiatives, we have advanced this goal by advocating for stronger regulation under and enforcement of the Packers and Stockyards Act, a federal law that promotes fairness and competition for the benefit of livestock producers, growers, and consumers, and protects independent producers from the abusive conduct of the packers. R-CALF has attempted to work closely with the past three presidential Administrations to encourage them to write the rules and regulations that will implement and enforce the Packers and Stockyards Act in a way that provides the protection R-CALF's members need.

19. Beginning in 2010, R-CALF strongly encouraged USDA to issue Packers and Stockyards Act Rules that would better effect the law's protections against unfair, unjustly discriminatory, deceptive, and preferential practices of packers. As part of this effort, R-CALF participated in the DOJ/USDA competition workshops preceding USDA's rulemaking process. *R-CALF USA Fact Sheet From DOJ-USDA Competition Workshop*, R-CALF (Aug. 27, 2010), https://www.r-calfusa.com/wp-content/uploads/competition/100827FactSheetForDOJ-USDACompetitionWorkshop.pdf. R-CALF also submitted public comments to guide the agency in its issuance of the Farmer Fair Practices Rule, a rule which proscribed certain conduct as violating the Packers and Stockyards Act, much like the Rule at issue today does.

20. R-CALF opposed certain prior actions taken by USDA R-CALF perceived weakened Packers and Stockyards Act regulation and enforcement, including when the USDA withdrew the Farmer Fair Practices Rule. *Producer Groups Urge President to Reverse Ag Secretary's GIPSA Decision*, R-CALF (Nov. 7, 2017), https://www.r-calfusa.com/producer-groups-urge-president-reverse-ag-secretarys-gipsa-decision/.

21. R-CALF also opposed the then Secretary of Agriculture's decision to weaken Packers and Stockyard Act enforcement by disbanding the Grain Inspection, Packers and Stockyards Administration ("GIPSA")—the standalone agency within USDA that had been responsible for administering the statute—and folding its responsibilities into the Agricultural Marketing Service. *Ranch Group Urges Secretary Perdue to Keep GIPSA a Stand-Alone Agency*, R-CALF (Oct 7, 2017), https://www.r-calfusa.com/ranch-group-urges-secretary-perdue-keep-gipsa-stand-alone-agency/.

22. R-CALF also voiced its opposition to the "Undue and Unreasonable Preferences and Advantages Under the Packers and Stockyards Act" rule released in 2020, which provided

packers with a list of safe harbors to employ when facing a producer's allegation that they had violated the undue and unreasonable preferences section of the Act. *R-CALF USA Statement on Final Undue Preference Rule*, R-CALF (Dec. 10, 2020), https://www.r-calfusa.com/r-calf-usa-statement-on-final-undue-preference-rule/.

23. While R-CALF engaged with USDA on the regulatory front to ensure the agency issued rules that effectively implemented the protections of the law, R-CALF also sought to protect our members by initiating our own litigation under the Packers and Stockyards Act to halt the anticompetitive conduct of packers. In 2019, R-CALF and four cattle-feeding ranchers from Iowa, Nebraska, Kansas, and Wyoming filed a class action lawsuit in federal district court in Chicago alleging the nation's four largest beef packers violated the Packers and Stockyards Act and other laws by conspiring to depress the prices paid to American ranchers, thereby inflating their own margins and profits. *R-CALF USA Alleges Packers Violated Packers and Stockyards Act*, FARM PROGRESS (Apr. 29, 2019), https://www.farmprogress.com/livestock/r-calf-usa-alleges-packers-violated-packers-and-stockyards-act. The lawsuit remains ongoing, although one of the Defendants has agreed to pay $83.5 million to settle plaintiffs' claims against it pending the court's approval. *R-CALF, National Farmers Union Reach Settlement with Meatpacker*, CAPITAL PRESS (Apr. 29, 2019), https://capitalpress.com/2025/02/04/r-calf-national-farmers-union-reach-settlement-with-meat-packer/.

24. Most recently, R-CALF was heavily involved in the Packers and Stockyards Act rulemaking efforts of the past four years. R-CALF submitted its own individual public comments on the Rule at issue in this lawsuit, which increases protections for livestock and poultry producers by proscribing specific practices that violate the Act.[1] R-CALF also worked in

---

[1] These comments will be in the administrative record for this case and are additionally available online at: https://www.regulations.gov/comment/AMS-FTPP-21-0045-0421.

coalition with allied agricultural advocacy organizations to file joint comments in this rulemaking to further ensure the regulation provided strong and meaningful protections for our members.[2] Moreover, we engaged on a subsequent rule that USDA proposed but never finalized entitled "Fair and Competitive Livestock and Poultry Markets," which would have defined "unfair" practices prohibited by the law as conduct that either harms market participants or conduct that harms the market (or both). Throughout this process, R-CALF met regularly with USDA representatives, encouraging them to propose the rules and making recommendations as to the substance of the rules.

25. R-CALF also successfully urged Congress to reject a policy rider from being included in the 2024 appropriations bill that would have blocked USDA from making progress on its Packers and Stockyards Act reforms by defunding enforcement of existing Packers and Stockyards Act regulations and preventing work on proposed and future rulemakings. *American Cattle Producers Grateful for Packers and Stockyards Act Wins*, R-CALF (Mar. 12, 2024), https://www.r-calfusa.com/american-cattle-producers-grateful-for-packers-and-stockyards-act-wins/.

26. The livelihoods and economic opportunities of R-CALF's members and other cattlemen and women depend on being able to run their businesses free of the discrimination, retaliation, and deception prohibited by the Rule and upon effective enforcement of the Packers and Stockyards Act. The Rule provides critical protections to R-CALF's members against this abusive conduct at the hands of packers. R-CALF and its members would suffer significant harm if the Rule was vacated as a result of this litigation.

---

[2] The two coalition comments R-CALF joined are available at: https://www.regulations.gov/comment/AMS-FTPP-21-0045-0434 and https://www.regulations.gov/comment/AMS-FTPP-21-0045-0423.

27.     Not only would vacating the Rule do away with the deterrent effect it has on packers from engaging in these practices in the first place, but it would also make it harder for R-CALF's members to vindicate their Packers and Stockyards Act rights through private enforcement actions once harm has been suffered. As an organization that litigates under the Packers and Stockyards Act on behalf of its members, R-CALF would also be directly injured by such a decision. R-CALF strongly believes the only way it can adequately protect its members' interests that are a stake in this action is by intervening in defense of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 31, 2025 in Billings, MT

_____
Bill Bullard